UNITED STATES DISTRICT COURT　　　　　NOT FOR ELECTRONIC
EASTERN DISTRICT OF NEW YORK　　　　　OR PRINT PUBLICATION
------------------------------------------------------------------------ x
DAVID HERION,　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　　　　　04-CV-5465 (ARR)
　　　　　　　　　　　Petitioner,　　　　　:
　　　　　　　　　　　　　　　　　　　　　　:
　　　-against-　　　　　　　　　　　　　:　　**OPINION AND ORDER**
　　　　　　　　　　　　　　　　　　　　　　:
WILLIAM PHILLIPS, Superintendent, Green Haven　　:
Correctional Facility,　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　Respondents.　　　　　:
------------------------------------------------------------------------ x
ROSS, United States District Judge:

　　　　On July 3, 2007, petitioner, David Herion, and a co-defendant, Michael Flournoy, were

convicted on two counts of attempted murder in the second degree, two counts of assault in the

first degree and one count of criminal possession of a weapon in the second degree in connection

with a September 23, 1996, incident in which numerous bullets were fired into a livery cab

occupied by Ronald Ashby ("Ronald") and his wife, Monique Ashby ("Monique"), as the cab

was stopped at a red light at Franklin and Lexington Avenues, Brooklyn. Although Ronald

suffered graze wounds to his back, neither Monique nor the driver of the cab, Ba Samba, were

injured. However, Carolyn Jones, a bystander who was conversing with her husband two blocks

further south on Franklin Avenue – was shot in the head and seriously injured.

　　　　Petitioner, proceeding pro se, now petitions this Court for a writ of habeas corpus

pursuant to 28 U.S.C. §2254, seeking his immediate release from the New York State

correctional facility in which he is serving a 45-year term of imprisonment in connection with

this crime. For the reasons set forth below, the petition is denied and this action is dismissed.[1]

---

[1]After receiving the initial response to his habeas petition, petitioner requested that counsel be
appointed to assist him in preparing his reply. The Court denied petitioner's request without prejudice to
renewal after the submission of all papers. Petitioner did not renew his application. In any event, having
reviewed the record, the Court determines that plaintiff's claims in this case raise no issues of substance
and, therefore, appointment of counsel would be inappropriate. See Cooper v. A. Sargenti Co., 877 F.2d
170, 172 (2d Cir. 1989).

*The Pre-Trial <u>Dunaway</u>/<u>Wade</u> Hearing*

The circumstances leading to petitioner's arrest and indictment were detailed in a pre-trial hearing conducted before Justice Alan L. Lebowitz on April 18, 1997. Homicide Detective Jorge Guzman testified that he had been at the crime scene on the night of September 23, 1996, when a police captain there received a call informing him that Michael Flournoy was one of the gunmen (H. 34-37).[2] Guzman did not know who had called the captain with this information (H. 35), but he knew Flournoy well enough to know his nickname – "Casino Mike" – and to be familiar with the car that Flournoy was driving at the time: a black Lexus with chrome wheels (H. 18-19).

Thereafter, Guzman and at least five of his fellow detectives went in search of Flournoy. About 11:00 p.m. on September 23 – about three hours after the shooting – they located Flournoy's Lexus, parked near another black Lexus near the corner of Tompkins and Lexington Avenues in Bedford-Stuyvesant (H. 19, 27-28). Both cars were occupied, but had tinted windows making it impossible to tell who was inside.

Guzman and his fellow officers promptly ordered the occupants out of both vehicles and down on the ground (H. 20, 30). Flournoy was not in either car (H. 21). However, Guzman recognized two of the four men who exited Flournoy's Lexus: petitioner, who Guzman had known for about two years by the nickname, "Bam," and Sean Howard, who Guzman knew by the nickname, "Seanibird" (H. 20, 32-33).[3] Guzman later learned that the two other men who were removed from Flournoy's Lexus were Ivory Seabrooks and Junior Jones (H. 22-23).

---

[2]Numbers preceded by "H" denote pages in the transcript of the hearing. Numbers preceded by "T" refer to pages in the trial transcript.

[3]Howard's nickname is spelled in various ways in the transcripts, police reports, written statements and other documents which comprise the voluminous record in this case. This Court will use the spelling which appears in the document being cited.

2

Guzman testified that by the time they found Flournoy's Lexus, he and his fellow officers had "information" that there were two gunmen responsible for that evening's shooting (H. 21). However, the source of that information was not provided at the hearing. Moreover, none of the officers had any information suggesting that petitioner or the other three men in Flournoy's car were in any way involved in the earlier incident. Nonetheless, shortly after 11:00 p.m., the detectives elected to take all four men to the 79th Precinct for questioning (H. 23, 31).

Sometime around 12:30 a.m. on September 24, 1996, Detective Isadore Johnson began interviewing the men who had been found in Flournoy's Lexus, including petitioner (H. 44). According to Johnson, petitioner was not handcuffed at the time of the interview and Johnson had no reason to believe that petitioner was a suspect in the shooting. Therefore, Johnson did not read petitioner his <u>Miranda</u> rights before speaking with him (H. 45).

Petitioner told Johnson that he had been riding his bicycle earlier that evening, and had stopped to see his girlfriend and his daughter (H. 45-46). At some unspecified point, he had "beeped" Seabrooks and, thereafter, had accompanied Seabrooks and Junior Jones to St. John's Hospital to see a friend named Sean, who had been shot (H. 46-47).[4] Petitioner stated that he had been arrested after leaving the hospital (H. 47). Although this statement was entirely exculpatory and there was no other information to inculpate petitioner, Johnson did not indicate to petitioner that he was free to leave and petitioner remained in the precinct for hours thereafter.

Johnson also interviewed Seabrook and Jones, and learned from both of them that petitioner's nickname was "Bam" (H. 44-45). Sometime thereafter, Johnson passed this information to the lead detective, Nadine Mosely (H. 48). About 4:20 a.m., Mosely conducted an

---

[4]This hospital is variously referred to in the trial transcript as "St. John's," "Interfaith" or "St. John's Interfaith." Presumably, all references refer to Interfaith Medical Center, a hospital located on Atlantic Avenue in Bedford-Stuyvesant.

3

interview with a confidential witness, later identified as Ronald, who named "Casino Mike" and "Bam" as the gunmen (H. 53).

Between 10:22 and 10:28 on the morning of September 24, 1996, petitioner appeared in a lineup which was viewed by three eyewitnesses to the shooting, including Ronald (H. 57-61). All three witnesses selected petitioner, and stated that they recognized him "from the shooting" (H. 58-61). In the late afternoon of September 24, 1996, an Assistant District Attorney read petitioner his Miranda rights and took a videotaped statement from petitioner. That videotaped statement, which was played at the hearing, was largely consistent with petitioner's earlier statement but provided more specifics. In it, petitioner clarified that he had been at the hospital only 10 to 15 minutes and had left around 9:30 p.m.

At the close of testimony, petitioner's trial counsel argued, inter alia, that the police lacked probable cause to arrest petitioner, and that petitioner's statements and the lineup evidence should be suppressed as fruits of an unlawful arrest. In response, the prosecutor attempted to cast the seizure of petitioner and the other occupants of Flournoy's car as investigative detention, saying:

> [The police] knew that there was an outstanding shooter, they knew they had a limited amount of time to act, as you do in all investigations, they found the car that belonged to one of the shooters and they brought [the occupants] in in order to question them (H. 146-47).

The prosecutor then argued that, even if the police lacked probable cause to arrest petitioner, there was no need to suppress evidence of the lineup:

> Even if Your Honor finds that at that point there was no probable cause, I'm stating that prior to the lineup, . . . they had probable cause in that this defendant they found out was named Bam, they

4

found out that the shooter was named Bam, and they found that out from a witness.

      \*      \*      \*

[A]s Your Honor well knows, there's attenuation, so that even if someone is in custody, and later police get probable cause, what happens after they get the probable cause is what's relevant, and in this case . . . nothing happened as far as this defendant prior to them finding out that his name was Bam, and that Bam was the shooter (H. 147-48).

The prosecutor reasoned that because the lineup had been conducted after the police learned of petitioner's involvement in the crime, both the lineup and the subsequent videotaped statement were admissible (H. 149).

Following oral argument, Justice Lebowitz denied the motions to suppress. Although the hearing court's oral decision is difficult to comprehend, Justice Lebowitz apparently adopted the prosecution's theory that the police were justified in bringing petitioner to the precinct "for investigative purposes" (H. 150). However, the oral decision further stated that petitioner was "not kept" at the precinct, implying that he remained there voluntarily (H. 151). Justice Lebowitz also implied that petitioner was not in custody when interviewed by Johnson, stating that petitioner had not been interrogated until "after <u>Miranda</u> warning were given to him" (H. 151).

### The Trial

In May 1997, petitioner and Flournoy went on trial before Justice Leon Ruchelsman and a Jury. The trial lasted over two weeks, during which the prosecution called over 20 witnesses. However, aside from Ronald, Monique and Samba, all of whom had been in the cab at the time of the shooting, there were only two eyewitnesses to the crime: Ronald Smith and Shameeka Coleman. Smith and Coleman were not strangers to the intended victims or to each other. Coleman is Monique's sister and was the longtime girlfriend of Smith, who is Ronald's father.

5

Smith and Coleman had seen the shooting from the window of their second-floor apartment at 318 Franklin Avenue, which is approximately one and one-half blocks north of Lexington Avenue.

Although the trial primarily focused on the events of September 23 and 24, 1996, the events leading up to the shooting began on September 5, 1996, when Ronald was shot in the back by Howard (T. 966). The bullet ricocheted upwards and lodged in Ronald's neck, where it remained at the time of trial (T. 967, 1121). According to Ronald, the shooting had not caused any permanent damage, and doctors felt that it would do more harm than good to remove the bullet (T. 967).

Ronald, who had known Howard for over ten years, was well aware of the identity of his assailant (T. 968, 1045). When police questioned him about the incident, however, Ronald told the police that he could not identify the person who shot him and did not know of anyone who might want to harm him (T. 1010-11). At trial, Ronald admitted that these were lies (T. 1011), but stated that he did not want the police involved (T. 1152). Instead, Ronald planned to exact revenge on his own.

It is unclear exactly how long Ronald spent in the hospital following the shooting. However, he did not act on his plan until September 23, 1996. Sometime that afternoon, Ronald went to the 318 Franklin Avenue apartment which Smith shared with Coleman and their children (T. 968-69). Monique – who was still married to, and living in the same house with, Ronald at the time, but was technically "separated" from him – was already at the apartment, visiting her sister, Coleman, when Ronald arrived (Monique: T. 661-62, 666; Smith: T. 478-80, 483). Ronald asked to borrow his father's Cadillac, ostensibly to drive to a Western Union office

6

(Smith: T. 480, 600; Monique: T. 666; Ronald: T. 969-70). Smith agreed to lend him the car, and Ronald left the apartment alone (Smith: T. 480-81; Monique: T. 667).

According to Ronald, he actually drove to a Western Union location near Gates and Marcy Avenues that evening, only to find it was already closed (T: 970). However, Ronald also testified that he had stopped en route to pick up a gun, ostensibly for his own protection (T. 1052-53; 1122-23). Sometime that evening, either by accident or design, Ronald encountered Howard and the two men exchanged gunfire (T. 970, 1056). Ronald testified that he had acted in self-defense, firing in Howard's direction only after Howard fired at him, and was initially unsure of whether he had struck Howard (T. 970-71, 1056).

At trial, Ronald and Smith had different recollections of what occurred next. Smith recalled receiving a phone call from Ronald, who said that he had shot at someone named "Shawniebird" and was being followed by a dark station wagon (T. 481, 583). Smith also remembered that Ronald sounded frightened, and that Smith had told Ronald to hurry to Smith's apartment (T. 481). Ronald, on the other hand, denied having ever told Smith or any other relative about his encounter with Howard (T. 971, 1057, 1090). Instead, Ronald testified that he returned to 318 Franklin Avenue on his own initiative, after stopping to throw the gun into a garbage can in or near a bodega at Greene and Marcy Avenues (T. 971, 1058, 1079).

Ronald returned to 318 Franklin Avenue about 7:30 p.m. (Monique: 668). According to Monique, Ronald asked her why she was still there and told her to call a cab so that they could go home (T. 668). While Ronald did not testify concerning the specifics of this conversation, he recalled that Monique had, in fact, called a cab within half-an-hour of his return to 318 Franklin Avenue (T. 971-72).

7

Ba Samba, a driver for United Express Car and Limousine Service, testified that he received a radio call around 7:50 p.m., instructing him to pick up passengers at 318 Franklin Avenue (T. 127-28). Shortly after his arrival at that address, Ronald and Monique emerged from 318 Franklin Avenue and entered the cab, with Ronald sitting behind the driver and Monique on the passenger side (Samba: T. 130, 148-49; Monique: T. 669; Ronald: T. 972). Smith and Coleman watched them enter the cab from the window of their second-floor apartment (Smith: T. 484; Coleman: 1175-76).

As Ronald and Monique were entering the cab, Smith noticed a black station wagon parked across the street, somewhere on the block north of 318 Franklin Avenue (T. 484, 538). The car had its headlights on, and matched the description of the car Ronald had mentioned during his telephone call earlier that evening (T. 484). Smith tried to warn his son, but was unable to do so because Ronald and Monique were already inside the cab (T. 486).

Coleman was also watching the black station wagon, which had aroused her suspicions because it was "parked like it was ready to pull out" into traffic, but failed to do so at the earliest opportunity (T. 1177). Both she and Smith saw the car follow the cab slowly down Franklin Avenue (Smith: T. 486; Coleman: T. 1177). The side windows of the car were tinted, making it impossible to see the driver's face (Smith: T. 489, 538-39, 547: Coleman: T. 1179). However, both Smith and Coleman testified that they could see the person occupying the front passenger seat through the untinted windshield and recognized him as "Casino Mike" (Smith: T. 487-88; Coleman: T. 1178-79).

The cab crossed Greene Avenue – the first cross street south of 318 Franklin Avenue – as the traffic light was turning red and stopped at a red light at Lexington Avenue, the next

8

intersection (Smith: T. 489; Ronald: T. 973; Coleman: T. 1180). The station wagon ran through the red light at Greene Avenue, then stopped directly behind the cab (Smith: T. 489; Coleman: T. 1179-80). Coleman became "scared" as soon as the station wagon ran the red light (T. 1179), and both she and Smith leaned out of the window of their second-floor apartment to see what would happen next.

By all accounts, men emerged from the station wagon shortly after it stopped and began shooting at the cab (Smith: T. 489-90; Monique: T. 674; Ronald: T. 976, 989; Coleman: 1181-84). However, Ronald and Monique had a much better view of the assailants than Smith and Coleman, who viewed the attack from approximately one and one-half blocks away. Each of the eyewitness's accounts of the shooting is set forth separately below.

### The Shooting

Ronald testified that the cab was stopped at Lexington Avenue when he "heard tires skid" behind him (T. 973). Although he was looking forward at the time, the cab had a partition between the front and rear seats, in which he saw the reflection of the station wagon's headlights as the car came to a stop behind the cab and saw the doors open (T. 974). Looking over his right shoulder and out the rear window of the cab, Ronald saw the same black car that had "slowed up next to [him]" earlier that day (T. 974) and two men standing outside of the car (T. 976).

Ronald recognized the men as "Casino Mike," whom he had known for over ten years, and "Bam," whom he had known for over two years (T. 977, 1149). Ronald specifically recalled that "Casino Mike" was on the driver's side of the cab with an automatic handgun in his hand (T. 986-87). "Bam" was on the passenger side, also holding a gun (T. 986-87, 1012). At trial, Ronald identified petitioner as "Bam" and Flournoy as "Casino Mike" (T. 987).

9

According to Ronald, he told Monique to "get down" (T. 1063). Monique did not comply, but looked back (T. 1063). Petitioner and Flournoy then began shooting at him while walking toward the side doors of the cab (T. 989). Ronald grabbed Monique, threw her down, and jumped on top of her, while yelling at the cab driver to "pull off" (T. 990). Monique attempted to push Ronald off her, and got halfway up before Ronald managed to pull her down again (T. 1064-65). The cab driver was slow to respond to Ronald's command and Ronald was grazed three times in the back (T. 990, 1015).

Thereafter, however, the cab continued down Franklin Avenue (T. 990). Although Ronald continued to hear shots as the cab sped away, both he and Monique stayed down until the cab reached Madison Street, four blocks from where the shooting occurred (T. 990-91, 1065). Ronald denied that he was frightened during the shooting (T. 1095-96), and testified that the incident "didn't seem quick" (T. 1145-46).

Monique's account of the shooting was largely consistent with Ronald's, but initially contradicted Smith and Coleman's testimony about having seen "Casino Mike" in the front passenger seat. On direct examination, Monique testified that she had seen the station wagon behind the cab even before it reached Greene Avenue, and that she thought she saw "Casino Mike" riding on the driver's side and "Shawniebird" on the passenger's side of the car (T. 672). However, on re-direct examination, Monique claimed that she had not seen any of the occupants of the station wagon until they were already outside of the car (T. 789).

Like Ronald, Monique recalled seeing "Casino Mike" standing behind the driver's side of the cab and a second gunman -- whom she then believed to be "Shawniebird" but identified at trial as petitioner -- standing behind her side of the cab (T. 675, 701, 703-04). Both men then began shooting, and Ronald pushed her down (T. 675-76). She pushed Ronald off her and

10

looked back again, to see both men shooting at the cab (T. 676, 791). She yelled for the cab driver to "go," then stayed down during the remainder of the incident (T. 677).

The cab driver, Samba, was unaware of the gunmen's presence until after the shooting began. Alerted by a "noise" which later proved to be the sound of bullets striking the partition, Samba turned to see people shooting at the back window of his cab (T. 130). Although his initial impulse was to "stop the car" (T. 131), Samba eventually sped south on Franklin Avenue at the urging of his passengers, both of whom were down on the floor of the cab (T. 132/133). Samba never saw the gunmen, and was unable to identify anyone at trial (T. 132/133, 135).

Smith's account of the shooting was similar to Ronald's and Monique's. Smith saw the station wagon stop behind the cab at Lexington Avenue and saw two men exit the station wagon: one from the front passenger seat and one from the driver's side rear door (T. 489). The man from the front seat – whom Smith had recognized as "Casino Mike" when the station wagon passed 318 Franklin Avenue – crossed in front of the station wagon and stood on the driver's side, in back of the cab (T. 489, 551). The other man – whom Smith thought was "Shawniebird" and not petitioner – went to the right side of the cab (T. 490-91, 543).

Both men then started shooting (T. 490). Smith saw "fire" emanating from the weapon held by "Casino Mike," but did not see the other gunman fire (T. 604-05). Indeed, Smith did not even see a gun in the other gunman's hand but saw him "pointing" and assumed that he "must have been pointing a gun" (T. 552).

The cab remained stationary at first, but "[e]ventually . . . pulled off," heading south on Franklin Avenue (T. 491). "Casino Mike" chased the cab on foot for about half a block, still shooting, but the other gunman turned right on Lexington Avenue and disappeared from view (T.

11

491-92). Smith, who testified that he was one and one-half blocks from the scene of the shooting (T. 549), readily admitted that he was too far away to see the faces of the gunmen (T. 596).

Unlike the other eyewitness, Coleman testified that there had been three assailants: "Casino Mike," "Bam," and another, unidentified man (T. 1181). Coleman repeatedly admitted that she was unable to see the gunmen's faces (T. 1196, 1229, 1247-48, 1250), and that she did not immediately recognize "Bam" (T. 1182, 1185, 1187). Although she saw the gunman whom she identified at trial as petitioner start shooting from the rear passenger's side of the cab (T. 1197), Coleman left the window almost immediately thereafter to retrieve a cordless telephone and call 911 (T. 1184). By the time she returned to the window, the cab had already driven away (T. 1184). She saw "Casino Mike" running down Franklin Avenue, but could no longer see the gunman whom she would later identify as petitioner (T. 1184-85).

Both Smith and Coleman testified that Coleman placed the call to 911 (Smith: T. 492; Coleman: T. 1184). However, Coleman was so excited or panic-stricken that she was unable to complete the call and gave the telephone to Smith, who then described what he saw to the 911 operator (Smith: T. 493; Coleman: T. 1185). The 911 call was played for the jury at trial.

Fearing that Ronald and Monique had been killed, Smith and Coleman immediately drove south on Franklin Avenue in search of them (Smith: T. 494; Coleman: T. 1185). In the block between Quincy and Gates – over two blocks south of the scene of the shooting – they encountered a crowd gathered around a woman who was laying on the ground (Smith: T. 495; Coleman: T. 1185). The woman, a 911 operator named Carolyn Jones, had been at the Evening Star Baptist Church at Franklin and Gates Avenues (Herman Jones: T. 1155, 1157). When the shooting began, she and her husband, Herman, were across the street from the church, talking and about to enter their cars which were parallel parked on Franklin Avenue (T. 1158-59).

12

Herman immediately told Carolyn to get in her car, but she was shot in the back of the head before she could do so (T. 1159).

While at Gates and Franklin Avenues, Coleman encountered Detective Nadine Mosely, who had received a radio call at about 7:55 p.m., reporting that a person had been shot at that location (Mosely: T. 228, 231, 305). According to Mosely, Coleman approached her as soon as she arrived, around 8:00 p.m. (T. 305). Although it is unclear precisely what occurred during this first interaction, Mosely testified that she "didn't speak" to Coleman, but that Coleman spoke to her (T. 305). Mosely recalled that Coleman only imparted her "knowledge of who was injured," but did not name or provide a description of any of the perpetrators (T. 305).

From the crowd gathered around Jones, Coleman learned that the cab was at Franklin Avenue and Fulton Street, about seven blocks further south (Coleman: T. 1186). She and Smith immediately drove to that location (Smith: T. 495; Coleman: T. 1186). Although they did not find Ronald or Monique there, Smith spoke to the cab driver, Samba, who reported that his passengers had been picked up by people in a white car (Smith: T. 586).

According to both Ronald and Monique, the people in the white car were two women – strangers who said they had seen the shooting and offered to help (Monique: T. 680, 716; Ronald: T. 992, 1031). Samba had refused to drive them further (Samba: T. 135), so Ronald and Monique accepted their offer. At Monique and Ronald's request, the women drove the couple to their original destination: 866 Knickerbocker Avenue, the Bushwick home in which Monique lived with her (and Coleman's) mother (Monique: T. 681, 716; Ronald: 992).

After Smith spoke to Samba, Coleman called her mother and learned that Monique and Ronald were at 866 Knickerbocker Avenue (Coleman: T. 1186). Smith and Coleman promptly

13

drove to that address, then drove the injured Ronald to Brooklyn Hospital (Smith: T. 495-96; Coleman: T. 1186).

Monique stayed with Ronald at the hospital (Monique: T. 685). Smith, however, testified that he and Coleman only remained at the hospital for about 20 minutes before returning to Franklin Avenue (T. 496, 536, 594). There, they encountered Detective Mosely for a second time (Mosely: T. 233; Smith: T. 536).

### The Police Investigation

Mosely, herself, had just returned from another hospital – St. John's Interfaith – where she had gone in search of victims of the shooting (Mosely: T. 230). There, Mosely had encountered a fellow detective, Richard Torres, who had arrived at the hospital sometime after 8:00 p.m. (Torres: 215; Mosely: T. 232). Torres had learned the name of one of the victims of the shooting, and had gone to the hospital – located only one or one and one-half miles from the crime scene – in the hopes of locating that person (Torres: T. 210). In the course of his investigation, he had questioned a black man with a bandaged leg who claimed to be "Tyrone Jones," and not the person Torres was looking for (T. 210-11). Later, Torres ascertained that the man was actually Howard, who was being treated for injuries he had sustained in his earlier encounter with Ronald (Torres: T. 211).

During their second encounter with Mosely, Smith and Coleman told Mosely that Ronald and Monique were at Brooklyn Hospital (Mosely: T. 308). It is unclear whether Mosely asked Smith or Coleman about the shooting itself. However, Mosely did not recall receiving any information regarding the perpetrators during the second conversation (T. 308).

Mosely and her partner, Detective Donna Stout, immediately went to Brooklyn Hospital. There, at around 9:30 p.m., Stout questioned Monique, who identified the perpetrators as

14

"Casino Mike" and "another boy" (Stout: T. 369, 371; Monique: T. 762). At the same time, Mosely interviewed Ronald. Although Ronald testified at trial that he told Mosely that he did not know who shot him (T. 1042), Mosely recalled that Ronald told her that one of the perpetrators "looked like 'Shawniebird' but it wasn't 'Shawniebird'" (T. 235).

According to Mosely and Stout, they left the hospital around 9:45 or 10:00 p.m. with both Ronald and Monique, whom they brought directly to the 79th Precinct (Mosely: T. 236; Stout: T. 370). Although Ronald testified that he was brought to the precinct by other detectives sometime after Mosely and Stout had left with Monique (T. 995, 1043), there is no question that Ronald was transported to the precinct that evening and that he and Monique were kept separate (Mosely: T. 238; Stout: T. 371; Ronald: T. 995-96). Smith and Coleman arrived at the precinct about the same time that evening, and were also kept separate from each other and all other witnesses (Mosely: T. 238; Stout: T. 371; Smith: T. 497; Coleman: T, 1187).

Detectives then began interviewing the four eyewitness, with Mosely interviewing Smith and Ronald, Stout interviewing Coleman, and a Detective Millwater interviewing Monique (Mosely: T. 239). Mosely interviewed Smith first, at around 10:35 p.m. (Mosely: T. 240; Smith: T. 497). By all accounts, Smith told Mosely that the gunmen were "Casino Mike" or "Mike Mike" and "Shawniebird" (Mosely: T. 240; Smith: T. 497, 536), though Smith testified that he first named "Shawniebird" prior to the interview, during a conversation with Mosely and another female detective on Franklin Avenue (T. 537). Smith never identified petitioner as one of the gunmen (Smith: T. 543).

Initially, none of the other three eyewitnesses identified petitioner, either. Although Mosely interviewed Ronald several times early in the morning of September 24, 1996, Ronald did not name petitioner as a gunman until approximately 4:20 a.m., after Mosely confronted him

15

about the shootout with Howard (Mosely: T. 319-21).[5]  At trial, Ronald claimed that he knew who had shot him all along (T. 994-95), but initially did not tell the detectives simply because he "[d]idn't want to" (T. 995).

Detective Millwater interviewed Monique twice, beginning around 11 p.m. on September 23, 1996 (Monique: T. 687, 692, 712).  Monique told Millwater that "Casino Mike" was one of the gunmen, but that she did not know the second one (T. 713).

Coleman testified that, when she arrived at the precinct that night, she did not know who, aside from "Casino Mike" had been involved in the shooting (T. 1187).  At some point, alone in an interview room at the precinct, Coleman reflected on the incident and came to the conclusion that "Shawniebird" had been one of the gunmen (T. 1190).  It is unclear whether Coleman reached that conclusion before or after her interview with Stout, which occurred at approximately 11:00 p.m. on September 23, 1996 (Stout: T. 371).  However, at some juncture, Coleman told the police that "Shawniebird" was one of the gunmen (Coleman: T. 1194).

Sometime between 11:00 and 11:30 p.m., Detective Guzman and other officers from the 79th Precinct arrested Howard, petitioner and five other men at the corner of Lexington and Tompkins Avenue (T. 1329).  All of the men were transported to the 79th Precinct.

When he arrived at the precinct, Howard had only recently been released from the hospital, and was not very mobile (Mosely: T. 293).  The police also had other reasons to believe

---

[5]By the time Mosely spoke to Ronald at 4:20 a.m., detectives had interviewed the men whom Guzman had arrested some five hours earlier – including Howard, who was on crutches and in obvious pain (T. 255).  From these interviews, Mosely had apparently learned of the shootout between Ronald and Howard, for she read Ronald his Miranda rights before questioning him (T. 321).  During the interrogation that followed, Ronald told Mosely about the September 5, 1996, incident and his shootout with Howard earlier on September 23, 1996 (T. 999, 1003, 1107).  He also told her about the shooting on Franklin Avenue, naming "Bam and Mike" as the gunmen (T. 1003).

16

that Howard could not have been one of the gunmen. As previously noted, Detective Torres had

seen Howard in the hospital shortly after the shooting (Torres: T. 210). In addition, Eric Calleja,

an officer from the 81ˢᵗ Precinct, interviewed Howard – who identified himself as "Tyrone Jones"

– at St. John's Hospital between 7:40 and 7:45 on the evening of September 23, 1996 (T. 650-

52). Calleja remembered that "Tyrone Jones" was being treated for a gunshot wound to the leg,

and specifically recalled that petitioner was in the company of his cousin, Denise (T. 657).

Calleja also recalled that Howard was still in the hospital when Calleja departed at 8:00 p.m. (T.

651-52). At trial, Calleja's recollections were corroborated by the testimony of a St. John's

Hospital resident, Dr. Mohammed Yousef/Udein, and hospital medical records, both of which

established that Howard had been in the hospital between 7:18 and 10:45 p.m. on September 23,

1996 (T. 808, 812).

Although it is unclear when petitioner, Howard and the other men arrived in the precinct,

the record indicates that Coleman, Monique and Ronald all had an opportunity to see petitioner

in the precinct sometime early on the morning of September 24, 1996 – before any of the three

identified petitioner to the police. Thereafter, all three witnesses separately viewed and identified

petitioner at a lineup, which was held sometime between 10:20 and 10:30 a.m. on September 24,

1996.

### The Re-Opened *Wade* Hearing

At the time of the pre-trial hearings, the prosecutor herself was unaware that the witnesses

had had any opportunity to view petitioner prior to the lineup. However, a few days after trial

had begun and after Samba and two minor police witnesses had already testified, the prosecutor

announced that she had just learned that two of the witnesses – Coleman and Monique – had

viewed petitioner prior to the lineup (T. 163, 180). Based on information received from his

client, petitioner's counsel believed that Ronald had also seen petitioner prior to the lineup, and moved for a mistrial (T. 180). The trial court denied that motion, but agreed to re-open the Wade hearing (T. 181).

The re-opened hearing was held in two parts, with Monique and Coleman testifying prior to their testimony and Ronald testifying several days later. The first part of the hearing was, therefore, held before any of the eyewitnesses had testified, but after Mosely, Stout and Torres had all testified.

At the hearing, Monique testified that, after her initial interview with Millwater, the detective had her sit in a hallway at the precinct (T. 403). After sitting alone for about five minutes, Monique saw a group of eight to ten men enter the hallway, all wearing handcuffs (T. 404, 411). One of the men was petitioner, whom Monique then recognized as having been one of the gunmen (T. 405). Monique remained in the hallway for about one to one and one-half minutes, with the group of men standing about a yard away, before Millwater returned and led Monique into an interview room (T. 405-06).

Monique testified that she had known petitioner for over five years (T. 400). During the first three of those years, she saw him almost every other day because he had been a frequent visitor to an apartment building in which she had lived (H. 401, 418, 421-22). During that period, she knew him well enough to say "Hi and bye" (T. 402). In addition, she remembered him distinctly from an incident in which he had attempted to push his way into one of her parties without paying (T. 401). She also claimed that she had seen petitioner on the day immediately before the shooting (T. 423), and that she had identified petitioner at the lineup based on her recollections of the shooting (T. 407).

Coleman testified that she had been in an interview room at the time she saw petitioner (T. 428). According to Coleman, a white, female detective had left the door to the room slightly ajar, enabling her to see petitioner, handcuffed, standing in the doorway (T. 428). Coleman and petitioner looked at each other for about 30 seconds before Coleman moved out of his line of sight (T. 428, 430, 438). However, petitioner remained in the doorway until a detective arrived and shut the door, while "raising hell" about the door having been left open in the first place (T. 429-30).

Like her sister, Coleman recalled petitioner from several years before, when petitioner had been a frequent visitor to one of their downstairs neighbors (T. 426). She testified that she had seen him regularly for about three years (T. 427), but much less frequently – if at all – since 1992, when she moved from the building he frequented (H. 439). Coleman testified that she had identified petitioner at the lineup based on her recollections of the shooting (T. 407).

At the close of Coleman's testimony, petitioner's counsel argued that neither viewing was inadvertent (T. 442). He argued that they were police-arranged viewings which had tainted the subsequent lineups, and urged the trial court to suppress those lineups (T. 443). Petitioner's counsel also pointed out that the prosecution had made no attempt to establish "independent source," implying that the in-court identifications should also be suppressed (T. 443-44).

In response, the prosecution conceded that it had not adduced any evidence of independent source (T. 444). The prosecutor argued that Monique had essentially viewed a "second lineup," since she had seen numerous men of the same race, all of whom were handcuffed (T. 445). The prosecutor further argued that the showup involving Coleman had been inadvertent, and that the identifications made by both Coleman and Monique had been essentially confirmatory, given their familiarity with petitioner (T. 445-46).

The trial court denied petitioner's motion to suppress the out-of-court and in-court identifications (T. 449-50). Justice Ruchelsman found that there was no evidence that the precinct viewings had been police-arranged, noting that Millwater had not been present at the time Monique saw petitioner in the hall and that a detective had been upset to find the door to Coleman's interview room open (T. 448). The court noted that both witnesses had stated that they recognized the person they identified at the lineup from the shooting, and that they both had known petitioner previously (T. 447-48). In addition, although there had yet to be any testimony concerning the witnesses' opportunities to view the shooting, the court stated that it was "satisfied that both woman [sic] had an independent notion of the identity of the shooter that was not bolstered by the viewing in the hallway" (T. 449).

The second part of the re-opened <u>Wade</u> hearing took place just before Ronald testified at trial. By that time, a dozen witnesses, including Smith and Monique, had already testified.

At the hearing, Ronald testified that he was sitting in an "area near a hallway" of the 79th Precinct sometime that night when he saw petitioner enter the hallway with other men (T. 944-46). Ronald knew petitioner, having met him more than two years earlier when petitioner and Ronald's brother had lived in the same house and had visited the same parole officer (T. 936). Although Ronald did not know petitioner's real name, he knew his nickname and would say, "Hi," when they met (T. 936-37). They met fairly frequently; Ronald testified that, during certain periods over the two years of their acquaintance, he sometimes saw petitioner "every day" (T. 937).

According to Ronald, petitioner and the other men emerged from a door to the left of the chair on which Ronald was sitting and simply walked down the hall (T. 949-50). Petitioner did not appear to be in handcuffs (T. 946). Ronald did not remember if the other men were

handcuffed or even how many other men there were, though he knew that there were more than two (T. 947). In addition, he could not recall if there had been any police officers with them at the time (T. 947-48).

Following Ronald's testimony at the hearing, petitioner's counsel again argued that the police had arranged to have Ronald view petitioner in this manner (T. 954-55). He noted that similar incidents had occurred on two other occasions that same night, and argued that this "purposeful showing" had tainted Ronald's subsequent lineup identification of petitioner (T. 955). Petitioner's counsel requested that the lineup be suppressed and that the court conduct an independent source hearing (T. 955). The prosecutor responded by arguing that Ronald had seen "numerous people," not just petitioner, in the hallway and that Ronald knew petitioner so well that any identification procedure would be "confirmatory" (T. 955-56).

The trial court denied petitioner's motion to suppress Ronald's identification testimony, noting that there was no evidence that the precinct viewing had been police-arranged (T. 956). Although Justice Ruchelsman did not specifically rule on suggestiveness, he noted that the Ronald had not seen petitioner in handcuffs (T. 956). The judge did not specifically rule that the lineup was confirmatory, but noted that Ronald had known petitioner for two years prior to the incident (T. 956).

### *The Identification Testimony*

At trial, the prosecution adduced proof that Monique, Ronald and Coleman had separately viewed and identified petitioner at a lineup conducted between 10:20 and 10:30 on the morning of September 24, 1996 (Monique: T. 704-05; Ronald: T. 1005; Coleman: 1195). In addition, all three witnesses identified petitioner in court as one of the gunmen (Monique: T. 701; Ronald: T.

21

987; Coleman: 1197). However, the jury also heard extensive testimony about the three witnesses' opportunities to view petitioner in the precinct prior to the lineup.

That testimony was largely consistent with the testimony at the re-opened Wade hearing, with some notable exceptions. First, Ronald, who had been uncertain at the hearing of precisely when he saw petitioner in the hallway, implied that it was sometime before the 4:20 a.m. interview at which he told Mosely that "Casino Mike" and "Bam" were the gunmen (T. 997). Second, Coleman, who had claimed at the hearing that petitioner was handcuffed when she saw him in the doorway of the interview room, testified at trial that she did not see any handcuffs because petitioner's hands were behind his back (T. 1240).

Monique, Ronald and Coleman all testified at trial that they were familiar with petitioner prior to September 23, 1996. However, Monique testified that at 12:15 a.m. on September 24, 1996, she had identified "Shawniebird" from a photographic array (T. 697-98, 713), telling Millwater that he "was the one that was shooting" (T. 719). In addition, she admitted that she told police that petitioner's name was "Shawniebird" when she identified petitioner at the lineup (T. 708). She explained that she knew both men – although she had only seen "Shawniebird" once before the shooting (T. 696-97) – and was uncertain of whether the man in the lineup was "Shawniebird" or "Bam" because they looked so much alike (T. 699, 706). She insisted, however, that she recognized the man she identified from the lineup as the person who had shot at her (T. 706-07).

Coleman, too, told police that the person she identified at the lineup was "Shawniebird" (Stipulation at T. 1332). Yet, Coleman was evasive on cross-examination and refused to unequivocally admit having done so, saying only that "maybe" she had (T. 1210-21). In addition,

22

Coleman frequently claimed not to remember details regarding the shooting and admitted that she had "trouble remembering stuff" (T. 1221-22).

Like her sister, Coleman knew both Shawniebird and petitioner and thought they looked alike (T. 1191-92). However, Coleman readily admitted that she had not identified petitioner by his face at the lineup, since she had not seen the faces of any of the gunmen (T. 1196, 1229, 1247-48, 1250). Rather, she identified him because he was wearing the "same clothes" she had seen on the gunman (T. 1243, 1270).

Aside from the eyewitness testimony of Monique, Ronald and Coleman, there was no evidence to tie petitioner to the shooting. No gun was ever recovered. On October 1, 1996, a Detective James Murray recovered a dark blue Mercury Sable station wagon (T. 879), which eyewitnesses later identified as the car from which the gunmen had emerged (Coleman: T. 1198). The car contained an insurance card in Howard's name (T. 880), but was being driven by two men – Raheem Slaughter and Marcus Deshawn Daniels – who were unrelated to the shooting (T. 879-80). Detective Shawn McNerny of the Crime Scene Unit removed 17 latent fingerprints from the car (T. 634). However, according to Detective Charles Schinkel of the Latent Print Unit, none of the prints belonged to either petitioner or Flournoy (T. 904-05, 909).

### *The Injuries to Carolyn Jones*

The prosecution called three witness regarding the injuries sustained by Ms. Jones: her husband, Herman Jones; her treating physician, Dr. Joseph Kohn; and Ms. Jones herself. Dr. Kohn testified that the gunshot had damaged the left parietal lobe of Ms. Jones' brain, resulting in damage to the speech and language centers (T. 1325-26). The doctor described his observations regarding her condition, saying "she can't find words" and "she can't express her

23

thoughts accurately or clearly in language" (T. 1325). Herman Jones also offered his observations of his wife's mental problems, recounting Ms. Jones' difficulty in reading, counting, and dialing a telephone (T. 1163).

Ms. Jones did not recall anything about the shooting (T. 1165). She also had little to say about her treatment, stating only that she was receiving therapy from three therapists, whose names she could not recall (T. 1166). However, her testimony gave the jury the opportunity to see her speak and to assess her mentality abilities.

### Summation

In summation, petitioner's counsel argued that Howard, not petitioner, was the gunman. He argued that petitioner closely resembled Howard, and had been identified because the police had "paraded [petitioner] around that precinct to all three of the witnesses before the lineup was conducted in handcuffs" (T. 1339). Noting that Howard had not appeared with petitioner in the lineup, petitioner's counsel contended that the witnesses had mistakenly identified petitioner, thinking he was Howard. He further noted that two of the witnesses had told the officers that the person they identified in the lineup was "Shawnybird," and argued, "[T]hey said Shawnybird and they meant Shawnybird" (T. 1343).

Petitioner's counsel maintained that it was only the prosecutor's "theory" that Howard was in the hospital at the time of the shooting (T. 1343), and that the evidence did "not conclusively show that Shawn Howard was at the hospital" then (T. 1346). He dismissed the St. John's Hospital records, which indicated that Howard had been admitted to the hospital at 7:18 on the evening of September 23, 1996, as inaccurate, noting that they also said that Howard had been shot at 7:30 p.m. (T. 1345). Counsel did not specifically discuss Officer Calleja's

24

testimony, but noted that Torres had not made any notes to substantiate his claim that he spoke to "Tyrone Jones" (who later proved to be Howard) at the hospital that night (T. 1344-45).

## *Verdict and Sentence*

The jury implicitly rejected petitioner's counsel's arguments. On May 28, 1997, after deliberating for approximately four hours, they found both petitioner and his co-defendant, Flournoy, guilty of two counts of attempted murder in the second degree (one with respect to Ronald, and the other with respect to Monique), two counts of assault in the first degree (both with respect to Carolyn Jones), and criminal possession of a weapon in the second degree. On July 3, 1997, Justice Ruchelsman sentenced petitioner to 15 years in prison on each of the five counts, with the first three counts consecutive to one another and with the remaining two counts running concurrent to one another and to the third count.

## *Petitioner's First § 440.10 Motion*

Petitioner timely filed a notice of appeal. After appellate counsel had been assigned to his case, but before his appeal was perfected, petitioner filed a pro se motion to vacate his conviction pursuant to section 440.10 of the New York Criminal Procedure Law ("CPL"), asserting ineffective assistance of counsel. Petitioner argued that his trial counsel had failed 1) to file an alibi notice pursuant to CPL § 250.20; 2) to interview two alibi witnesses – Shawn Howard and Junior Jones; 3) to subpoena records relating to an Interfaith Hospital pay phone from which petitioner had allegedly called his sister, Shalita Brown, at approximately 7:35 p.m. on September 23, 1996; and 4) to interview two other witness – Juliet Williams and Martis Daniels – who allegedly had information favorable to the defense.

In a sworn affidavit submitted in support of this motion, petitioner stated that he had told his trial counsel that he was at Interfaith Hospital with Howard at the time of the shooting and

25

that both Howard and Junior Jones could corroborate this fact. Affidavit of David Herion, dated Oct. 26, 2001 ("Herion Aff."), at ¶¶ 15, 17. Petitioner also submitted an affidavit from Howard, who stated that both petitioner and Howard's cousin, Denise, had been with him between 7:50 and 8:15 p.m. on September 23, 1996 (Affidavit of Shawn Howard, dated Mar. 21, 2001 ("Howard Aff.") at ¶ 4), as well as an affidavit from Junior Jones, who stated that he had seen petitioner enter the hospital at approximately 7:20 p.m. (Affidavit of Junior Jones, dated Mar. 21, 2001 ("Jones Aff.") at ¶ 4). In their affidavits, both Howard and Jones stated that they had told petitioner at the time of his arrest that they were willing to testify as alibi witnesses, and that they would have "gladly" made themselves available to anyone who wished to interview them, but that no one ever contacted them on petitioner's behalf (Howard Aff. at ¶¶ 5-6; Jones Aff. at ¶¶ 7-8).

In his affidavit, petitioner also alleged that "at approximately 7:35 p.m. - 7:45 p.m. he called his sister Shalita Brown from a public phone" at Interfaith Hospital (Herion Aff. at ¶ 16). In support of that allegation, petitioner attached an affidavit from Brown, who stated that she had received a call from petitioner around 7:40 p.m. on September 23, 1996, and that they had spoken for about ten minutes (Affidavit of Shalita Brown, dated Feb. 15, 2001 ("Brown Aff.") at ¶ 4). According to Brown, petitioner told her that he was at Interfaith Hospital with a friend who had been shot (Id.). In his affidavit, petitioner stated that he had told his trial counsel about this telephone call and had requested that his attorney "obtain the phone records for outgoing telephone calls from a pay phone at Inter-faith Medical Center," but that "[t]rial counsel inexplicably failed to subpoena" them (Herion Aff. at ¶¶ 16, 28).

Petitioner also stated that, as part of pre-trial discovery, the prosecution had turned over to defense counsel police reports concerning Stout's September 23, 1996, interview with an

eyewitness, Juliet Williams, and Detective Murray's October 1, 1996, interview with Martis Daniels (Id. at ¶¶29, 32). According to petitioner, Williams stated that she saw only one black male exit a burgundy or black van – not a station wagon – and begin shooting (Id. at ¶ 30). In support of this claim, petitioner attached a sworn affidavit from Williams dated February 9, 2000, in which Williams stated that only one man had emerged from the van and fired the shots. However, that statement was inconsistent with the police report, which indicated that Williams had seen "2/M/B's" (i.e., two male blacks) emerge from the van. Petitioner further stated that on October 1, 1996, when the police found the Mercury station wagon, Daniels had told them that he had been using the car for the "last three weeks" (Herion Aff. at ¶ 8).

Along with his sworn affidavit, dated October 26, 2001, petitioner filed an unsigned and unsworn "Supplemental Affidavit." This document made certain allegations with respect to one Cleveland Wilks, a security guard who was working at Interfaith Hospital on the evening of September 23, 1996, and attached an investigator's report in which Wilks stated that he might have seen petitioner at the hospital that evening.

On or about April 5, 2002, the prosecution filed its response to petitioner's § 440.10 motion, which included two separate affidavits from petitioner's trial counsel. In the first, dated January 29, 2002, counsel stated that he had not filed an alibi notice because, "to [his] knowledge, no witness was prepared to testify at trial that [petitioner] was at a location other than the scene of the incident in question" (Affidavit of Greely Tyson, dated Jan. 29, 2002, at 2). Counsel stated that he had interviewed Howard "on the same day that [petitioner] was produced for a hearing or trial," and that Howard "did not state that [petitioner] was with him at St. Johns Hospital during the time of the subject incident" (Id.). He also stated that, at some unspecified point, he had received a message from Junior Jones, stating that Jones "did not want to be

involved in this case, and . . . would not testify at trial" (Id.). Finally, trial counsel stated that Wilks had been uncertain of the time or place he saw petitioner, and "would not testify that he saw [petitioner] at the hospital at the time of the subject incident" (Id.)

In that same affidavit, petitioner's trial counsel stated that he had been unsuccessful in locating Williams or Daniels. According to counsel, he had made "numerous visits" to the homeless shelter where Williams lived and had left messages asking Williams to contact him, but had never located her (Id.). Counsel further stated that he had spoken to Daniels' mother, who claimed that Daniels had left the state, then refused to provide counsel with her son's current address (Id. at 3). Counsel admitted that he had not subpoenaed records relating to any telephone at Interfaith Medical Center (Id.).

In the second affidavit, dated March 28, 2002, trial counsel specifically addressed petitioner's allegation that he had been "fully informed . . . of his claimed alibi defense and of the existence of two alibi witnesses, Shawn Howard and Junior Jones" (Supplementary Affirmation of Greely Tyson, dated Mar. 28, 2002, at ¶ 3). Counsel stated that he and petitioner had "discussed . . . the possibility of presenting an alibi defense," but had "both agreed not to pursue that defense because there was no alibi witness who could say that defendant had been at St. John's Hospital at the time of the shooting" (Id. at ¶ 4). Counsel denied that defendant had ever asked him to contact Howard as a potential alibi witness, and that he had met with Howard only to see how closely he resembled petitioner (Id. at ¶ 5). Indeed, counsel recalled that petitioner had told him that he had been unsuccessful in his attempts to visit Howard at the hospital, and that Jones was unwilling to be involved in petitioner's defense (Id. at ¶¶ 5, 7).

Less than two weeks after receiving this response, petitioner filed a reply, including an affidavit which squarely controverted his trial counsel's claims. Petitioner denied having agreed

to forego his alibi defense, stating that trial counsel had never discussed the merits of the alibi defense but had only said that he would "look into it" (Reply Affidavit of David Herion, dated April 17, 2002, at ¶¶ 3-4). Noting that there were factual issues concerning what had transpired between petitioner and trial counsel, and what Junior Jones and Howard had said to trial counsel, petitioner requested an evidentiary hearing (Id. at ¶ 7).

It is highly unlikely that Justice Ruchelsman received petitioner's reply memorandum before deciding the § 440.10 motion. Petitioner's Reply Affidavit, the accompanying memorandum of law, and the cover letter attaching these documents are all dated April 17, 2002. Although the cover letter recites that an affidavit of service was filed with the Clerk of the Supreme Court, the record does not contain a copy of this affidavit. However, even assuming that these documents were delivered to prison officials on April 17, 2002, it seems very unlikely that Justice Ruchelsman could have received them by the next day – the date on which he issued his decision. Indeed, date stamps on the reply papers submitted to this Court indicate that the Kings County District Attorney's Office received the papers on April 25, 2002.

In his decision, dated April 18, 2002, and entered April 19, 2002, Justice Ruchelsman summarily denied petitioner's § 440 motion. Although Justice Ruchelsman made no explicit findings of fact, he noted that defense counsel had "stated in an affidavit that he consulted with the defendant and they both agreed that calling the alleged alibi witnesses would only hinder the defense strategy they had developed" (People v. Herion, Ind. No. 14346/96, slip op. at 2 (N.Y. Sup. Ct. Apr. 18, 2002)). Justice Ruchelsman implicitly credited this statement, concluding that "the failure to call [alibi] witnesses was something contemplated and agreed to by the defendant" (id.), and held that the decision not to call alibi witnesses was, in any event, a strategic decision by the attorney. The court did not expressly address petitioner's claim that trial counsel had

failed to adequately investigate the alibi, but stated that the same rationale applicable to the failure to call alibi witness "also necessitate[d] a denial of many of the defendant's claims since they were all part of the attorney's strategy which the defendant knew and understood" (Id.).

### Direct Appeal

On direct appeal, petitioner raised six arguments, the first two of which challenged the denial of his suppression motions. In his first argument, petitioner challenged the denial of his Dunaway motion, arguing that defendant had been arrested without probable cause and that the lineups were fruits of his illegal seizure. The second argument related to the Wade motion, asserting that the three witnesses who had identified petitioner had viewed a police-arranged "precinct showup of [petitioner] in handcuffs" prior to the lineup, which had rendered the subsequent identifications of petitioner unreliable.

In his third argument, petitioner argued that the evidence was insufficient to prove his involvement in the shooting, and that the verdict was against the weight of the evidence. His fourth argument challenged the prosecution's decision to call Carolyn Jones as a witness, asserting that she "could give no evidence in the case," and was called solely to evoke sympathy. Petitioner's fifth argument asserted that petitioner's trial counsel was ineffective because he failed to investigate petitioner's alibi defense, failed to interview alibi witnesses named by petitioner, and failed to give the alibi notice required under CPL § 250.20. Finally, petitioner argued that his sentence was harsh and excessive.

In its response to the first point in petitioner's appellate brief, the prosecution conceded that the police had lacked probable cause to arrest petitioner. Respondent's Brief at 32. However, the prosecution argued that suppression of the lineup identifications was not warranted because they "were untainted by the previously illegality." Id. The prosecution noted that the

police had learned of petitioner's involvement in the shooting from an "independent source," unrelated to the illegal arrest, hours before the lineups took place. The prosecution reasoned that since the information obtained from the "independent source" gave the police probable cause to arrest petitioner prior to the lineup, the identification procedures were not a fruit of the earlier Fourth Amendment violation.

Petitioner's appellate counsel did not file a reply brief. However, petitioner himself filed a pro se supplemental brief relating solely to the prosecution's "independent source" argument. Petitioner principally argued that the prosecution's argument was unpreserved for appellate review because the People had not raised the issue at the hearing. Petitioner also argued that the independent source exception was, in any event, inapplicable to the circumstances of this case.

On October 21, 2002, the Appellate Division, Second Department, unanimously affirmed petitioner's conviction (People v. Herion, 298 A.D.2d 529 (N.Y. App. Div. 2002)). With respect to the Dunaway issue, the Court essentially adopted the prosecution's analysis. The Court held:

> Although the defendant's initial arrest was unlawful, the defendant's lineup identification occurred only after the police learned from independent sources that the defendant was one of the perpetrators. Since this information was gained from independent sources without exploitation of the illegal arrest, suppression of the lineup identification testimony was properly denied . . . .

(Id. at 529 (citation omitted)). In addition, the Court expressly held that "[t]he sentence imposed was not excessive" (Id.). However, the Court did not specifically address the remaining issues, stating:

> The defendant's remaining contentions, including those raised in his supplemental pro se brief, are unpreserved for appellate review, without merit, or relate to claims which do not warrant reversal.

(Id.)

Thereafter, petitioner applied for leave to appeal to the New York Court of Appeals. That application was denied by Chief Judge Kaye on February 13, 2003 (People v. Herion, 99 N.Y.2d 615 (2003)).

## Petitioner's Petition for a Writ of Error Coram Nobis

In April 2004, petitioner, proceeding pro se, petitioned the Appellate Division, Second Department for a writ of error coram nobis, asserting that his appellate counsel had provided ineffective assistance. Petitioner primarily faulted appellate counsel for failing to brief issues relating to the jury charge. However, petitioner also argued that appellate counsel had failed to file a reply brief contending that the prosecution's "independent source" argument in opposition to his Fourth Amendment claim was unpreserved (Memorandum of Law in Support of Petitioner's Motion for a Writ of Error Coram Nobis, at 14).

On September 20, 2004, the Appellate Division denied petitioner's application (People v. Herion, 10 A.D.3d 693 (N.Y. App. Div. 2004)). The Court succinctly held that petitioner had "failed to establish that he was denied the effective assistance of appellate counsel . . ." (Id. (citations omitted)). Thereafter, petitioner sought, but was denied, leave to appeal this ruling to the New York Court of Appeals (People v. Herion, 3 N.Y.3d 757 (2004)).

## The Habeas Corpus Proceedings

In early December 2004, petitioner commenced the instant action by filing a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. As originally drafted, that petition (hereinafter referred to as the "Original Petition") raised six grounds for relief. However, the fifth ground – alleging that petitioner's trial counsel provided ineffective assistance by failing to file investigate petitioner's alibi, interview witnesses or file an alibi notice – was manually crossed out on the copy which was filed with this Court.

The first two grounds raised in the Original Petition related to the suppression hearings. First, petitioner argued that he had been arrested and detained without probable cause, but that the trial court had "refused to suppress" the "fruits of the unlawful detention" (Original Petition, ¶ 13(1)). Second, petitioner asserted that the witnesses who identified him in the lineup "could only do so after seeing him in handcuffs at the precinct," and that the court had "err[ed] in admitting the evidence of the line[up] and the in-court identification of [petitioner] . . . without conducting an independent source hearing" (Id., ¶ 13(2)).

The third and fourth grounds related to the evidence at trial. As a third ground for habeas relief, petitioner asserted that the evidence adduced at trial was insufficient to prove his guilt beyond a reasonable doubt or that the verdict was against the weight of the evidence. In the fourth ground, petitioner argued that the prosecution had denied him a fair trial by calling Carolyn Jones as a witness, claiming that she had "no evidence to give" and was called "merely to elicit sympathy and incite deep-seated hostility" (Id., ¶ 13(4)). Finally, as a sixth ground, petitioner argued that the sentence imposed was harsh, excessive, and an abuse of the trial judge's discretion.

### The Second § 440.10 Motion

In June 2005, after the response to the Original Petition had been filed, petitioner sought, and was granted, a stay of the habeas proceedings to permit him to file a second motion pursuant to CPL § 440.10. This motion, which was filed in August 2005, was largely based on a sworn affidavit of Shameeka Coleman, dated September 30, 2003 (the "Coleman Affidavit"), in which Coleman recanted her testimony identifying petitioner. In that affidavit, Coleman stated that she had seen four men shooting at the cab, but did not recognize any of them (Coleman Affidavit at 2, 3). Coleman further claimed that she had initially told Mosely that was she was unable to

identify anyone, and that she and Smith had agreed to testify against petitioner and Flournoy only after their February 1997 arrest on drug charges.

Relying on this testimony, petitioner advanced several arguments. First, he argued that his conviction should be vacated because Coleman had recanted her identification of him. Second, petitioner asserted that the prosecution had knowingly used perjured testimony to obtain an indictment and a conviction. This argument was based largely, but not exclusively, on the Coleman Affidavit. In arguing that petitioner was indicted based on perjured testimony, petitioner asserted that Coleman's identification of petitioner as one of the gunmen was belied by the fact that she did not identify petitioner in her initial written and audiotaped statements and, in the latter, had professed not even to know a person with the nickname, "Bam." In arguing that the prosecution used perjured evidence at trial, petitioner claimed that Ronald had testified falsely about seeing petitioner walk up to the right side of the cab and fire at Monique from "point blank range." Third, petitioner asserted that the prosecutor had withheld Brady material by failing to disclose that Coleman had initially told Mosely that she did not recognize any of the perpetrators.

In a Decision and Order dated August 30, 2006, Justice Ruchelsman denied this motion. The judge noted that a new trial could be granted on the basis of newly discovered evidence only if such evidence was, inter alia, "of such character that it would probably change the result of a new trial" (People v. Herion, Ind. No. 14346/96, slip op. at 3 (N.Y. Sup. Ct. Kings Co. Aug. 30, 2006)). However, Justice Ruchelsman found "scant evidence that Coleman not identifying [petitioner] would have made any difference at the trial" (Id. at 4).

*Petitioner's Amended Habeas Petition*

On December 19, 2006, petitioner filed a second habeas petition, which petitioner entitled an "Amended Habeas Petition." This "Amended Petition" raises only one of the grounds listed in the Original Petition: the argument that the prosecutor had improperly called Carolyn Jones to testify concerning the extent of her injuries. However, the Amended Petition also includes an expanded version of the ground which had been crossed off of the Original Petition: an ineffective assistance argument faulting trial counsel for failing 1) to file an alibi notice, 2) to interview potential alibi witnesses Junior Jones and Shawn Howard, 3) to subpoena hospital pay phone records that might have corroborated his alibi, and 4) to investigate the possibility of calling two other witnesses, Juliet Williams and Martis Daniels.

The other two grounds raised in the Amended Petition relate to issues which petitioner raised in his April 2004 petition for a writ of error coram nobis and his second § 440.10 motion. First, petitioner argues that "[t]he recantation of a star prosecution witness, the prosecution's knowing use of perjured testimony, and its failure to disclose <u>Brady</u> material consisting of that witness' prior inconsistent statement declaring that she could not identify the shooter violated [petitioner's] right to due process of law" (Appendix to Amended Petition at 3). Second, petitioner raises one of the grounds set forth in his coram nobis petition, claiming that his appellate counsel provided ineffective assistance by failing "to file a reply brief challen[g]ing the prosecution's appellate argument in opposition to his 4th Amendment claim as unpreserved, and arguing the lack of intervening actions rendered the resultant lineups illegal" (<u>Id</u>.).

35

# DISCUSSION

## A. Standard of Review

The Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), enacted in 1996, added the following provision to 28 U.S.C. § 2254 as subsection (d):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

This deferential standard of review applies only when the federal claim has been "adjudicated on the merits" by the state court. Aparicio v. Artuz, 269 F.3d 78, 93 (2d Cir. 2001). If there is no such adjudication, the deferential standard does not apply; courts "apply the pre-AEDPA standards and review de novo the state court disposition of the petitioner's federal constitutional claims." Id. (citing Washington v. Schriver, 255 F.3d 45, 55 (2d Cir. 2001)).

An "adjudication on the merits" is a "substantive, rather than a procedural, resolution of a federal claim." Sellan v. Kuhlman, 261 F.3d 303, 313 (2d Cir. 2001) (quoting Aycox v. Lytle, 196 F.3d 1174, 1178 (10th Cir. 1999)). A "conclusive presumption" that the state court decision "rest[s] on the merits of the federal claim" applies to decisions "fairly appearing to rest primarily on federal law or to be interwoven with federal law . . . [a]bsent a clear and express statement of reliance on a state procedural bar." Jimenez v. Walker, 458 F.3d 130, 138 (2d Cir. 2006).

Under 28 U.S.C. § 2254(d)(1) – sometimes called the "contrary to" clause – "a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412–13 (2000) (O'Connor, J., concurring and writing for the majority in this part). Under 28 U.S.C. § 2254(d)(2) – sometimes called the "unreasonable application" clause – "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the [Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. However,

> a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

Id. at 411. Thus, in order to grant a writ there must be "some increment of incorrectness beyond error." Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000) (internal quotation marks omitted). "[T]he increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." Id.

An application for a writ of habeas corpus on behalf of a person in State custody cannot be granted unless "the applicant has exhausted the remedies available in the courts of the State, or . . . there is an absence of available State corrective process; or . . . circumstances exist that render such process ineffective to protect the rights of the applicant." 28 U.S.C. § 2254(b). To exhaust a claim, a petitioner must present to the state court "both the factual and legal premises of the claim he asserts in federal court," Daye v. Attorney General, 696 F.2d 186, 191 (2d Cir.

37

1982) (en banc), and must give the state courts "one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999). "To provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim." Baldwin v. Reese, 541 U.S. 27, 29 (2004) (citing Duncan v. Henry, 513 U.S. 364, 365-66 (1995) (per curiam) and O'Sullivan, 526 U.S. at 845).

Before enactment of the AEDPA, courts were required to dismiss a state prisoner's federal habeas petition if the prisoner did not exhaust available state remedies as to any of his federal claims. See Rose v. Lundy, 455 U.S. 509, 522 (1989). However, the AEDPA changed the law in this regard, permitting district courts, in their discretion, to deny on the merits habeas petitions containing unexhausted claims – so-called "mixed petitions." See 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the state.").

## B.    *Petitioner's Grounds for Habeas Corpus Relief*

As a preliminary matter, this Court must determine whether to construe petitioner's Amended Petition as a supplemental submission, rather than an amended pleading. This Court is well aware that petitioner is proceeding pro se; on May 6, 2005, this Court denied petitioner's application for appointment of counsel, without prejudice to renewal after the submission of all papers. Moreover, this Court is mindful that a pro se litigant's submissions should be held "to less stringent standards than formal pleadings drafted by lawyers." Hughes v. Rowe, 449 U.S. 5,

9 (1980) (quoting Haines v. Kerner, 404 U.S. 519, 520 (1972)); McEachin v. McGuinnis, 357 F.3d 197, 200 (2d Cir. 2004)).

While some pro se litigants might fail to grasp the distinction between an amended submission and a supplemental submission, petitioner does not appear to be such a litigant. His papers are unusually thorough and highly articulate, demonstrating a fairly precise use of the English language. In his Amended Petition, petitioner carefully recounts the issues which have been raised on direct appeal and in each of his post-conviction submissions. However, he makes no mention of the grounds set forth in his Original Petition. Rather, he lists only the grounds set forth in the Amended Petition. In addition, at least one of the grounds listed in the Amended Petition – the issue concerning the propriety of calling Carolyn Jones as a witness – is raised in both the Original and Amended Petitions. These facts militate in favor of the conclusion that petitioner was fully cognizant of implication of labeling his second habeas petition an "amended" – rather than a supplemental – petition, and that he meant the second habeas petition to supercede the first. Accordingly, for purposes of this memorandum and order, this Court will address in detail below only those issues raised in the Amended Petition.[6]

_____

[6]This Court has reviewed the grounds raised in petitioner's Original Petition and finds that none appears to have merit. The first ground essentially faults the hearing court for denying petitioner's Dunaway motion. However, "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." Stone v. Powell, 428 U.S. 465, 494 (1976). Since petitioner fully litigated his claim before Justice Lebowitz, this Court could not grant relief on this ground even if it disagreed with the hearing court's determination.

The second ground essentially faults Justice Ruchelsman for denying petitioner's Wade motion. In determining whether a defendant's due process rights were violated through the use of improper identification evidence, courts engage in a sequential, two-step analysis. A court first determines if the pretrial identification procedures were unduly suggestive and, if so, then determines whether the identification was nonetheless independently reliable. See Raheem v. Kelly, 257 F.3d 122, 133 (2d Cir. 2001) (citing Manson v. Brathwaite, 432 U.S. 98, 114 (1977); Neil v. Biggers, 409 U.S. 188, 199 (1972)). In determining reliability, a court considers the totality of the circumstances, including the following five factors: (1) the witness's opportunity to view the criminal at the time of the crime; (2) the witness's degree of attention at that time; (3) the accuracy of the witness's prior description; (4) the

1. *Ineffective Assistance of Trial Counsel*

As a first ground for habeas corpus relief, petitioner asserts that he was denied the effective assistance of trial counsel by counsel's failure (1) to file an alibi notice, (2) to interview

---

witnesses level of certainty; and (5) the time between the crime and the confrontation. Brathwaite, 432 U.S. at 114-16. However, even if a court concludes that a pretrial identification procedure was unduly suggestive and rendered a witness's identification of a defendant unreliable, the error in admitting that testimony is still subject to harmless error analysis. Id. at 142; Wray v. Johnson, 202 F.3d 515, 525 (2d Cir. 2000). Under that analysis, an error is harmless unless it had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993).

The circumstances under which Ronald viewed petitioner at the 79th Precinct prior to the lineup were not unduly suggestive. Ronald only saw petitioner walk down a hallway in the company of other men, and testified that petitioner did not appear to be in handcuffs (T. 946). The circumstances under which Monique saw petitioner were somewhat more suggestive in that she saw petitioner wearing handcuffs, albeit with seven to nine other men who were also in handcuffs. However, even assuming that these circumstances were unduly suggestive, Monique's testimony would still be reliable in light of her excellent, if brief, opportunity to view the gunmen, her high degree of attention to them, the level of certainty she expressed in her identification and the relatively short time between the crime and her encounter with petitioner.

The circumstance under which Coleman viewed petitioner were far more suggestive, in that petitioner was alone and handcuffed when Coleman saw him in the doorway of the interview room. Moreover, given Coleman's extremely limited opportunity to view the perpetrators, this Court could not find her subsequent lineup identification of petitioner to be reliable. However, as explained in some detail in section B.3 below, Coleman's identification testimony was so thoroughly impeached that this Court cannot find that the admission of this testimony, even if erroneous, had a "substantial and injurious effect or influence in determining the jury's verdict." See Brecht, 507 U.S. at 623.

The third ground for habeas relief set forth in the Original Petition – that the evidence was insufficient to sustain the verdict and that the verdict was against the weight of the evidence – is also without merit. The identification testimony of three eyewitnesses unquestionably provided sufficient evidence to convict petitioner of the five crimes of which the jury found him guilty. Moreover, "[i]t is well established that 'weight of the evidence' claims are not cognizable on federal habeas review." Taylor v. Poole, ___ F. Supp. 2d ___, 2008 WL 591007, at *3 (S.D.N.Y. Feb. 28, 2008); see White v. Keane, 969 F.2d 1381, 1383 (2d Cir. 1992).

The final ground for relief set forth in the Original Petition – that the sentence imposed was harsh, excessive, and an abuse of the trial judge's discretion – is also not cognizable in a habeas corpus proceeding. "[I]t is well established that no constitutional issue is presented for habeas corpus relief where a sentence imposed falls within the range prescribed by state statutory law." Alvarez v. Scully, 833 F.Supp. 1000, 1003 (S.D.N.Y. 1993); see also White v. Keane, 969 F.2d 1381, 1383 (2d Cir.1992). The 15-year sentences imposed on each of the five counts on which petitioner was convicted were within the statutorily permissible range. With the exception of criminal possession of a weapon in the second degree – which is a Class C violent felony offense, N.Y. Penal Law §70.02(1)(b) – all of the offenses of which petitioner was convicted were Class B violent felonies. N.Y. Penal Law §70.02(1)(a). Since petitioner was adjudicated a second felony offender, see Sentencing Minutes at 4, he could have received a determinate sentence of up to 25 years for the Class B violent felonies, N.Y. Penal Law §70.06(6)(a), and up to 15 years for the Class C violent felony. N.Y. Penal Law §70.06(6)(b).

two potential alibi witnesses – Shawn Howard and Junior Jones, (3) to subpoena hospital pay phone records and (4) to investigate the possibility of calling Juliet Williams and Martis Daniels. In order to demonstrate ineffective assistance of counsel, a petitioner must satisfy the two-pronged test established in Strickland v. Washington, 466 U.S. 668 (1984). Under Strickland, a petitioner must demonstrate, first, that counsel's performance fell below "an objective standard of reasonableness" under "prevailing professional norms," id. at 688, and second, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 698. A court need not decide both prongs of the Strickland test if a party has made an insufficient showing on one. See id. at 697.

In analyzing a claim that counsel's performance fell short of constitutional standards, the court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689. Moreover, "[i]n assessing the attorney's performance, a reviewing court must judge his conduct on the basis of the facts of the particular case, 'viewed as of the time of counsel's conduct, and may not use hindsight to second-guess his strategy choices.'" Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994) (quoting Strickland, 466 U.S. at 690). Thus, a petitioner cannot prevail on a claim of ineffective assistance merely because he disagrees with his counsel's strategy. See Strickland, 466 U.S. at 689. However, failure to pursue a particular course of action is not considered strategic when it is not a "conscious, reasonably informed decision made by an attorney with an eye to benefitting his client." See Pavel v. Hollins, 261 F.3d 210, 218 (2d Cir. 2001).

Since petitioner's ineffective assistance of counsel claim was denied on the merits by the state court, he must show that the state court's decision was contrary to, or an unreasonable application of, federal law. The Second Circuit has already determined that the New York

standard for ineffective assistance of counsel applied by the state court in its denial of petitioner's claim is not contrary to Strickland. See Eze v. Senkowski, 321 F.3d 110, 123 (2d Cir. 2003). Accordingly, in order to obtain federal habeas relief, AEDPA requires petitioner to show that the state court "'applied Strickland to the facts of his case in an objectively unreasonable manner.'" See Eze, 321 F.3d at 124 (quoting Bell v. Cone, 535 U.S. 685, 698-99 (2002)).

In this case, this Court cannot find that the trial court applied Strickland in an objectively unreasonable manner. Justice Ruchelsman correctly held that the decision not to pursue an alibi defense was a strategic decision by the attorney. Indeed, in his Supplementary Affirmation in opposition to petitioner's first § 440.10 motion, petitioner's trial counsel expressed his belief that "it was preferable as a trial strategy to distance defendant from any witness who was friends with Howard because the shooting of Howard provided a motive for the incident with which defendant was charged." Supplementary Affirmation at ¶ 6. Such "[s]trategic choices of trial counsel 'are virtually unchallengeable' in habeas corpus proceedings." Bonneau v. Scully, Nos. 86 Civ. 270 (CSH), 86 Civ. 3901 (CSH), 1991 WL 90739 (S.D.N.Y. May 23, 1991) (citation omitted), aff'd, 956 F.2d 1160 (2d Cir. 1992); Weeks v. Senkowski, 275 F. Supp. 2d 331, 341 (E.D.N.Y. 2003) (counsel not ineffective for failing to pursue trial strategy in which petitioner's alibi defense would be that he was with other murderers drinking at a different location); Walker v. Henderson, 492 F.2d 1311, 1313 (2d Cir. 1974) ("decision to call or bypass particular witnesses is peculiarly a question of trial strategy . . . which courts will practically never second guess" in considering allegation of ineffective assistance of counsel), cert. denied, 417 U.S. 972 (1974).

Because Justice Ruchelsman almost certainly did not receive petitioner's reply papers, dated April 17, 2002, before issuing his April 18, 2002, decision on petitioner's initial § 440.10

motion, the judge did not explicitly resolve the factual issues of whether defense counsel ever discussed the alibi defense with petitioner in any detail or contacted the alibi witnesses identified by petitioner. However, even assuming that defense counsel unilaterally rejected the alibi defense out of hand, without talking to Howard or Junior Jones or investigating the hospital pay phone records, this Court could not find that defense counsel's actions were unreasonable.

First, petitioner's proposed alibi defense was fraught with difficulties which would have been readily apparent to an experienced defense counsel even early in the case. Most notably, petitioner's own videotaped statement – in which he stated that he had stayed at the hospital only 10 to 15 minutes and had left around 9:30 p.m. – was inconsistent with the claim that petitioner had been with Howard at 7:55 p.m., the time of the shooting. Moreover, there would have been no way to advance the defense without the jury learning of the close relationship between petitioner and Howard. As petitioner's counsel noted in his Supplementary Affirmation, that evidence would have provided the prosecution with strong evidence of a plausible motive for the shooting – namely, petitioner's desire to avenge Howard, who had been shot earlier that same evening by Ronald. In addition, evidence of the close relationship between Howard, petitioner and Junior Jones would have generally undermined the credibility of the alibi witnesses.

Second, there was no need to use the alibi defense, since the facts permitted a fairly powerful misidentification argument. There was no physical evidence to connect petitioner to the crime. Moreover, two of the four eyewitness – Smith and Coleman – had seen the crime from a considerable distance, more than one and one-half blocks away. The remaining two eyewitnesses – Ronald and Monique – had only a brief opportunity to view the perpetrators under the most stressful of circumstances: immediately before and during the perpetrators' attempt to murder them. Therefore, even assuming that petitioner's counsel had rejected the alibi defense

out of hand, without a thorough investigation, this Court would not find that petitioner's counsel's performance fell below "an objective standard of reasonableness" under "prevailing professional norms." See Strickland, 466 U.S. at 688.

In addition, there is not "a reasonable probability" that the result of the proceeding would have been different had petitioner's counsel chosen a different strategy. See id. at 698. Indeed, the wisdom of foregoing the alibi defense became all the more apparent as the trial progressed. The evidence adduced at trial permitted petitioner's counsel to make an unusually strong misidentification argument.

First, although Smith and Coleman both testified that they had seen Flournoy in the station wagon as it passed their house, neither had seen the face of the second gunman. Smith consistently identified that gunman as "Shawniebird" and refused to identify petitioner at the lineup. Coleman testified that she did not know who the second gunman was until after the stationhouse showup. Even though Coleman ultimately identified petitioner at the lineup, she told the police that his name was "Shawniebird" and that she recognized him not because of his face but only because of his fairly nondescript clothes – a black jacket, bluish jeans and brownish Timberland boots.

Second, while both Ronald and Monique claimed to have seen the gunmen, neither immediately named petitioner, even though they professed to have known petitioner for years. Even though Ronald claimed to have known both perpetrator's identities from the beginning, Mosely remembered him expressing some confusion concerning one gunman's identity, saying that he "looked like 'Shawniebird' but it wasn't 'Shawniebird'" (T. 235). Ronald did not name petitioner as one of the gunmen until after he saw petitioner walking through a hallway at the precinct. Monique, too, could not identify the second gunman until after she viewed petitioner in

44

the hallway. Moreover, at the lineup, Monique identified petitioner as "Shawniebird," despite her familiarity with petitioner. These facts gave petitioner's counsel a substantial basis for arguing that the second gunman was actually "Shawniebird" and that the lineup identifications and subsequent in-court identifications were the result of suggestive and unfair police identification procedures.

Some of the evidence adduced at trial also would have posed potentially serious problems for an alibi defense. Police Officer Eric Calleja of the 81st Precinct testified that he had actually had been with Howard between 7:40 and 7:45 on the evening of September 23, 1997. Calleja had not only interviewed Howard, but also took note of who else was with him at that time. He was, therefore, able to testify – consistent with Howard's own affidavit – that Howard's cousin, Denise, was with Howard that evening. Although Howard stated in his affidavit that petitioner had left his bedside for ten or fifteen minutes beginning at approximately 7:30 p.m., this testimony would have placed petitioner back with Howard about the time Calleja left. Even assuming that Howard was wrong about the time, and that petitioner's sister was entirely accurate in stating that petitioner had called her at 7:40 p.m. and remained on the line for ten minutes, Calleja implied that he had seen Howard as late as 8:00 p.m. (T. 651-52). In light of this testimony, petitioner's proposed alibi defense would have been extremely risky, since defense counsel had no way of knowing what Calleja observed, and could not be certain of whether Calleja was in a position to refute the alibi witnesses.

Although petitioner also faults petitioner for his failure to call Juliet Williams and Martis Daniels, there is no evidence that counsel acted unreasonably in failing to call them or that their testimony would have affected the outcome of the trial. First, petitioner has not adduced any evidence to refute his counsel's claim that he attempted to locate these witnesses and was

45

unsuccessful in doing so. Second, neither witness had particularly significant testimony to give. Williams' claim that she had seen a single man emerge from a black or burgundy van and begin shooting was not only inconsistent with the testimony of the other eyewitnesses – all of whom recalled two or more men emerging from a station wagon – but was also partly inconsistent with a statement that she had given to Detective Stout on the night of the crime, in which she recalled seeing two gunmen. Daniel's testimony that he had been in possession of the Mercury Sable station wagon for three weeks prior to its seizure on October 1, 1997, might, at most, have established that this station wagon was not the vehicle involved in the crime. However, because no evidence of petitioner's involvement in the crime was recovered from the station wagon, Daniel's testimony would not have reduced the amount of evidence against petitioner.

In sum, petitioner did not establish that his trial counsel's performance fell below "an objective standard of reasonableness" under "prevailing professional norms," or that, "but for counsel's unprofessional errors, the result of the proceeding would have been different." See Strickland, 466 U.S. at 688, 698. The State court, therefore, applied Strickland in an objectively reasonable manner in rejecting petitioner's claim of ineffective assistance of trial counsel. Accordingly, petitioner's first ground for habeas relief is without merit.

### 2.	*Ineffective Assistance of Appellate Counsel*

As a second ground for habeas corpus relief, petitioner argues that his appellate counsel provided ineffective assistance of counsel by failing "to file a reply brief challen[g]ing the prosecution's appellate argument in opposition to his 4[th] Amendment claim as unpreserved, and arguing the lack of intervening actions rendered the resultant lineups illegal." Appendix to Amended Petition at 2. The two-prong Strickland test, set forth above at p. 41, applies to claims of ineffective assistance of appellate counsel as well as of trial counsel. See Aparicio v. Artuz,

269 F.3d 78, 95 (2d Cir. 2001) (citing Evitts v. Lucey, 469 U.S. 387, 396-97 (1985)). A habeas petitioner may establish constitutionally deficient assistance if he shows that his appellate counsel "omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." Clark v. Stinson, 214 F.3d 315, 322 (2d Cir. 2000). However, "[t]he failure to include a meritless argument does not fall outside the wide range of professionally competent assistance to which [a] [p]etitioner [i]s entitled." Aparicio, 269 F.3d at 99 (internal quotation marks and citations omitted). Finally, even if an attorney's performance were objectively unreasonable and unprofessional, the petitioner must still prove prejudice. That is, the petitioner must show "'a reasonable probability' that, but for the deficiency, 'the result of the proceeding would have been different.'" Aparicio, 269 F.3d at 95 (quoting Strickland, 466 U.S. at 694).

In this case, petitioner has not demonstrated that his appellate counsel's representation fell below "an objective standard of reasonableness." Petitioner does not take issue with any of the six points raised by appellate counsel in the 80-page main brief. Rather, petitioner takes issue only with appellate counsel's refusal to raise certain issues in reply to the prosecution's response to his Fourth Amendment claim. Specifically, petitioner claims 1) that the prosecution's argument – that the exclusionary rule did not mandate suppression of the lineup because the police had learned of petitioner's involvement from untainted, "independent sources" – was unpreserved for appellate review and 2) that this independent source argument was, in any event, without merit.

The prosecution's argument, however, was adequately preserved. Although she used the term "attenuation" rather than "independent source" during the oral argument following the hearing, the prosecutor clearly argued that, even if the police lacked probable cause at the time

they arrested petitioner, they had obtained probable cause by the time petitioner was placed in the lineup. The prosecutor argued, in relevant part:

> Even if Your Honor finds that at that point there was no probable cause, I'm stating that prior to the lineup, . . . they had probable cause in that this defendant they found out was named Bam, they found out that the shooter was named Bam, and they found that out from a witness.
>
> *            *            *
>
> [A]s Your Honor well knows, there's attenuation, so that even if someone is in custody, and later police get probable cause, what happens after they get the probable cause is what's relevant, and in this case . . . nothing happened as far as this defendant prior to them finding out that his name was Bam, and that Bam was the shooter (H. 147-48).

The prosecutor then went on to remind the judge that the lineup had been conducted after the police learned of petitioner's involvement in the crime, and implied that both the lineup and the videotaped statement were admissible (H. 149).

The prosecution's response to the Fourth Amendment argument set forth in Point I of petitioner's main appellate brief relied on the same legal principles which undergirded the prosecutor's argument before the hearing court. The prosecutor argued that the lineup was not a fruit of petitioner's unlawful arrest because they had learned of petitioner's involvement in the crime from an "independent source" prior to the lineup. Respondent's Brief at 31-32. Although the prosecution's brief used the term, "independent source," and not "attenuation," the rationale expressed in the appellate brief was identical to that used by the prosecutor before the hearing court. Therefore, petitioner's appellate counsel did not err in failing to raise the preservation point urged upon her by petitioner.

Petitioner's argument that his appellate counsel provided ineffective assistance in failing to respond to the prosecution's "independent source" argument is also without merit. In the main

brief, petitioner's counsel anticipated the prosecution's "attenuation" argument, arguing, <u>inter alia</u>, that there were "no intervening circumstances which separated the original illegality from the time of the lineup." Brief for Defendant-Appellant, at 45. While petitioner's counsel did not address this issue in great detail, and did not file a reply brief to specifically address the "independent source" argument set forth in Respondent's Brief, her failure to do so was not unreasonable and did not fall below the level of prevailing professional practices.

Even assuming that petitioner could establish that his appellate counsel's failure to address the "independent source" argument fell below "an objective standard of reasonableness" under "prevailing professional norms," <u>Strickland.</u> 466 U.S. at 688, he could not show any prejudice flowing from that failure. After receiving Respondent's Brief, petitioner requested and received permission to file his own Supplemental Brief, which effectively served as a reply brief. That brief capably addressed the very issues which petitioner now faults his appellate counsel for failing to raise. Although these issues may have lacked merit for the reasons set forth above, it is hard to imagine that appellate counsel could have done a much better job in presenting these arguments to the Appellate Division. Therefore, petitioner's second ground for habeas corpus relief is also without merit.

## 3.  *Grounds Related to Coleman's Recantation*

As a third ground for habeas corpus relief, petitioner raises several issues relating to Coleman's September 30, 2003, affidavit recanting her testimony identifying petitioner as a shooter. Referring to Coleman as a "star prosecution witness," petitioner asserts that her recantation, the prosecution's knowing use of her perjured testimony, and its failure "to disclose <u>Brady</u> material consisting of [Coleman's] prior inconsistent statement declaring she could not

identify the shooter" independently violated his rights to due process of law. Appendix to Amended Petition at 2. None of these arguments has merit.

### a.     *Coleman's Recantation*

To the extent that petitioner is arguing that a conviction based in part on Coleman's recanted testimony violated his due process right to "elemental fairness," this argument is procedurally barred. While petitioner argued in his second § 440.10 motion that "due process requires that the government grant 'elemental fairness' to an accused," and that "elemental fairness" is denied when an accused is convicted on the basis of false testimony, see Memorandum of Law in Support of Petitioner's Second § 440.10 Motion at 2-3, that argument was expressly based solely on the State Constitution. Id. at 2 (noting that "[t]he New York State Constitution grants an accused greater rights than those provided in the Federal Constitution") and 3 (stating that petitioner's incarceration "violates 'elemental fairness', and thus, runs afoul of the due process clause of the State Constitution). Moreover, a claim of "newly discovered evidence on the basis for a witness's recantation is not an argument that is 'commonly thought to involve constitutional constraints'" Arce v. Comm'r. of Correctional Servs., No. CV-06-5573 (BMC), 2007 WL 2071713, at *2 (E.D.N.Y. July 17, 2007). Therefore, even if petitioner had not explicitly based this argument on State constitutional principles, this Court would not find that his argument was sufficient to "'alert . . . the court to the claim's federal nature' by presenting the 'substance' of a federal claim." Id. (quoting Picard v. Connor, 404 U.S. 270, 278 (1971)). Moreover, even if this "elemental fairness" claim were exhausted, it would wholly without merit for the reasons set forth in subsection (c) below.

50

### b.    *The Prosecution's Use of Perjured Testimony*

Petitioner's second claim with respect to the recantation – that the prosecution knowingly used perjured testimony when it permitted her to identify petitioner as one of the gunman – is analyzed under the Due Process Clause of the Fourteenth Amendment. See Napue v. Illinois, 360 U.S. 264, 269 (1959). Under this analysis, a petitioner has the initial burden of proving, by a preponderance of the evidence, that a witness committed perjury. See Ortega v. Duncan, 333 F.3d 102, 106 (2d Cir. 2003). Moreover, even if the prosecution knew or should have known of the perjury, a conviction must be set aside only if "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." United States v. Agurs, 427 U.S. 97, 103 (1976). On the other hand, "when false testimony is provided by a government witness without the prosecution's knowledge, due process is violated only if the testimony was material and the court is left with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted." Ortega, 333 F.3d at 106 (internal quotation marks and citations omitted).

Coleman's recantation alone does not suffice to sustain petitioner's burden of proving by a preponderance of the evidence that her testimony identifying petitioner was perjured. Indeed, the Coleman Affidavit itself contains numerous statements which are demonstrably false. For example, Coleman's claim that there were four perpetrators wearing baseball caps (Coleman Affidavit at 2) is not only inconsistent with her own trial testimony, but at odds with the testimony of every other eyewitness, none of whom saw more than two perpetrators and none of whom mentioned baseball caps. Coleman's claim that Smith called "911" (id.) is not only contradicted by trial testimony in which she and Smith both stated that she called "911," but

disproved by the tape of the "911" call itself. Similarly, Coleman's claim that she and Smith

arrived at Interfaith Hospital at "approximately 8 p.m." – about five minutes after the shooting –

is clearly inaccurate, given the circuitous route to the hospital taken by the four eyewitnesses.

Finally, Coleman's recollection of having told Mosely that she did not recognize any of the four

gunman is both inconsistent with her own trial testimony, and with police notes and reports

concerning her statements to detectives shortly after the shooting.

Even assuming, arguendo, that petitioner could establish that Coleman's trial testimony

identifying him as a perpetrator was perjured, there is nothing to suggest that the prosecutor knew

or should have known that Coleman was not telling the truth when she identified petitioner.

Coleman had identified petitioner at a lineup on the morning following the shooting, before any

Assistant District Attorney arrived at the precinct. Although the prosecutor eventually learned

during trial that the lineup might have been tainted by an accidental showup, this discovery did

not give the prosecution any reason to believe that Coleman's identification of petitioner was a

deliberate fabrication.

Moreover, while the Coleman Affidavit states that Smith and Coleman "agreed to lie"

about Casino Mike and petitioner's involvement in shooting in order to obtain a favorable

disposition in their own drug case, Coleman does not specifically allege that the prosecutor was

aware that their testimony would be untrue. The Coleman Affidavit states only that sometime

following Coleman's February 7, 1997, arrest on the drug charges, an "Assistant District

Attorney . . . named Liz offered [Smith and Coleman] a deal if [they] testif[ied] against Michael

Flournoy and David Herrion [sic]." Coleman Affidavit at 3. Moreover, to the extent that

Coleman's Affidavit implies that "Liz" suborned perjury by offering a favorable plea deal, this

implication is demonstrably false. By the time Smith and Coleman were arrested on February 7, 1997, Coleman had already identified petitioner as one of the gunmen.

Furthermore, even if the prosecution knew of should have known that Coleman was lying with respect to her identification of petitioner, there is not a "reasonable likelihood that the false testimony could have affected the judgment of the jury." United States v. Agurs, 427 U.S. at 103. Although petitioner characterizes Coleman as a "star" prosecution witness (Appendix to Amended Petition at 2), she was only one of three eyewitnesses to identify petitioner as one of the gunmen. Of those three, she had the worst opportunity to view the perpetrators. Not only did she view the shooting from the second-story window of her home, located almost two blocks behind the gunmen, but she left the window during the shooting and only returned in time to see "Casino Mike" chasing the cab down the block (T. 1184). As a result, Coleman never had an opportunity to see the face of the gunman whom she identified as petitioner (T. 1196, 1229, 1247-48, 1250).

The questionable reliability of Coleman's identification of petitioner was thoroughly exposed at trial. Coleman was the only one of the eyewitness to testify that there were three gunmen, not two. On direct examination, she testified that she did not realize who the second shooter was until hours later, after the informal showup in which she viewed petitioner with his hands behind his back standing in the doorway of the interview room (T. 1185, 1187, 1193, 1230, 1240-41). Even then, she told Stout that the perpetrator's name was "Shawnibird" (T. 1194). When she identified petitioner at the lineup, Coleman told police that his name was "Shawnibird" (T. 1332), and that she recognized him "because he got on the same clothes" (T. 1243).

Coleman's credibility was further undermined during cross examination. She was highly uncooperative, claiming that she had "trouble remembering stuff" (T. 1222). She insisted that her home was only one-half block from the scene of the shooting, forcing defense counsel to introduce photographic evidence indicating that it was at least one and one-half blocks away (T. 1224-27). In addition, she testified that she had entered into a cooperation agreement with respect to an indictment charging her with selling crack, in which she agreed to testify against petitioner in the hopes of obtaining a favorable disposition (T. 1260).

By the end of her testimony, Coleman's identification testimony had been so thoroughly discredited as to be of little, if any, assistance to the prosecution. The conviction was obtained largely on the strength of the testimony of the Ashbys, both of whom viewed the incident from close range and had an opportunity to view the gunmen's faces. Accordingly, this Court cannot find that there is a "reasonable likelihood" that Coleman's testimony, even if false, affected the judgment of the jury.

### c. *Brady Violation*

Petitioner's third claim with respect to Coleman's recantation charges the prosecution with violating Brady v. Maryland, 373 U.S. 83 (1963), by failing to disclose Coleman's "prior inconsistent statement declaring she could not identify the shooter." Appendix to Amended Complaint at 2. In Brady, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady, 373 U.S. at 87. The Supreme Court subsequently held that the prosecution has a duty to disclose such evidence even in the absence of a defense request, Agurs, 427 U.S. at

54

107, and that the duty encompasses not only exculpatory evidence, but also information which can be used to impeach government witness. <u>United States v. Bagley</u>, 473 U.S. 667, 676 (1985). It is the latter type of evidence – so-called <u>Giglio</u> material, <u>see</u> <u>United States v. Madori</u>, 419 F.3d 159, 169 (2d Cir. 2005) – that is at issue here.

Under <u>Brady</u>, evidence is "material" only "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." <u>Strickler v. Greene</u>, 527 U.S. 263, 280 (1999). Thus, although the term "<u>Brady</u> violation" is sometimes used to refer to any breach of the prosecutor's duty to disclose exculpatory or impeachment material, the breach does not rise to the level of a due process violation "unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different result." <u>Id</u>. at 281. In other words,

> There are three components of a true <u>Brady</u> violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.

<u>Id</u>., 527 U.S. at 281-82.

In this case, petitioner asserts that the prosecution violated <u>Brady</u> by failing to disclose that Coleman had told Mosely that she could not recognize or identify the gunmen. This assertion is based solely on a portion of the Coleman Affidavit, which states that Coleman was interviewed by Mosely and Stout and "told them . . . that she did not recognize any of the . . . shooters." Coleman Affidavit at 2. The prosecution has contested the accuracy of this statement, noting that the only recorded interviews of Coleman occurred at the 79th Precinct just before midnight on September 23, 1996, during which Coleman told Stout that one of the gunmen was

"Casino Mike" and that the second shooter might have been "Shawnee Bird." See Affirmation in

Response to Second § 440.10 Motion, Ex. 5.

Like the prosecution, this Court has serious doubts concerning the accuracy of Coleman's

statements. As previously noted, many of the statements contained in the Coleman Affidavit are

demonstrably false. However, there is nothing in the record that contradicts Coleman's

representations as to what she told the detectives, and some evidence that is at least consistent

with those representations. Mosely herself testified that she had spoken with Coleman on

Franklin Avenue on two occasions before Stout interviewed Coleman at the precinct (T. 305,

308). Moreover, Mosely testified that, on the first occasion, Coleman had not named or

described any of the perpetrators (T. 305), and that on the second occasion, neither Smith nor

Coleman had told her anything about the perpetrators (T. 308). Although there is no evidence

that Mosely asked Smith or Coleman about the perpetrators, it seems likely that an experienced

detective would have done so.

If Coleman had, in fact, told Mosely or Stout that she could not recognize or identify the

shooters, her statement would have been Giglio material, which should have been disclosed

pursuant to Brady and progeny.[7] However, even assuming that such Giglio material existed and

that the prosecution inadvertently failed to disclose it, this nondisclosure would not constitute a

"true Brady violation" because there is not a reasonable probability that the suppressed evidence

would have produced a different result. See Strickler, 527 U.S. at 281-82. As noted above,

Coleman repeatedly testified on direct examination that she did not realize who the second

---

[7]The fact that the prosecutor may have never learned of this prior inconsistent statement is of no moment, since the Brady rule "encompasses evidence 'known only to police investigators and not to the prosecutor.'" Id. at 280 (quoting Kyles v. Whitley, 514 U.S. 419, 437 (1995)).

56

shooter was until hours after the shooting (T. 1185, 1187, 1193, 1230, 1240-41). Since the Giglio material was consistent with this testimony (albeit arguably inconsistent with her ultimate identification of petitioner), it is difficult to imagine what possible use petitioner's counsel could have made of the Giglio material in cross examining Coleman. Accordingly, petitioner was not prejudiced in the least by the nondisclosure of the Giglio material and was not deprived of his due process right to a fair trial.

### 4.     *The Propriety of Calling Carolyn Jones as a Witness*

Petitioner's final ground for habeas corpus review and the only issue raised in both the Original and Amended Petitions relates to the prosecution's decision to call the severely injured Carolyn Jones as a witness. In his Amended Petition, petitioner makes no mention of a federal Constitutional violation, but simply asserts that "[t]he prosecutor improperly called the victim to testify to the extent of her injuries." Appendix to Amended Complaint at p. 2. However, there is no doubt that petitioner is attempting to raise the same issue which he raised in his main brief on direct appeal, wherein he asserted that it was "reversible error" to admit the testimony of Ms. Jones, and that this error deprived him of his due process right to a fair trial. Brief for Defendant-Appellant, Point IV, pp. 70-74.

In order for an evidentiary error under state law to constitute a due process violation under the federal Constitution, a petitioner must show "that the error was so pervasive as to have denied him a fundamentally fair trial." Collins v. Scully, 755 F.2d 16, 18 (2d Cir. 1985) (citing United States v. Agurs, 427 U.S. 97, 108 (1976)). Satisfying this standard requires a petitioner to establish that the evidence was (a) erroneously admitted under New York law and (b) "sufficiently material to provide the basis for conviction or to remove a reasonable doubt that

57

would have existed on the record without it." Collins v. Scully, 755 F.2d 16, 19 (2d Cir. 1985).
Petitioner cannot meet this standard, for Carolyn Jones' testimony was not inadmissible under
New York law.

Petitioner was charged, inter alia, with several counts of assault in the first degree in
connection with the shooting of Ms. Jones. In order to prove petitioner guilty of these counts, the
prosecution was required to prove that petitioner had caused, or the Ms. Jones had suffered,
"serious physical injury." See N.Y. Penal Law § 120.10(1), (3) and (4). The term "serious
physical injury" is defined to mean:

> physical injury which creates a substantial risk of death, or which
> causes death or serious and protracted disfigurement, protracted
> impairment of health or protracted loss or impairment of the
> function of any bodily organ.

N.Y. Penal Law §10.00(10).

In order to establish this element, the prosecution called Ms. Jones' husband, Herman,
and her treating physician, Dr. Joseph Kohn. Dr. Kohn testified that the gunshot had damaged
the left parietal lobe of Ms. Jones' brain, resulting in damage to the speech and language centers
(T. 1325-26). The doctor described his observations regarding her condition, saying "she can't
find words" and "she can't express her thoughts accurately or clearly in language." (T. 1325).
Similarly, Herman Jones offered his observations of her mental problems, recounting Ms. Jones'
difficulty in reading, counting, and dialing a telephone. (T. 1163).

While these general descriptions of Ms. Jones' condition, together with medical records,
might have sufficed to prove serious physical injury, the prosecution was entitled to allow the
jury to make their own assessment of her speech and language deficits. While Ms. Jones had no

recollection of the events of September 23, 1996, her testimony spoke volumes concerning her abilities to speak and express herself in language. Accordingly, this Court cannot find that the prosecution acted improperly in calling her to testify, or that the trial court erred in admitting her testimony into evidence. Therefore, this court cannot grant relief upon this ground.

## CONCLUSION

For the reasons stated above, the petition for a writ of habeas corpus is denied. Because petitioner has failed to make a "substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2) (1996), no certificate of appealability will be granted. The Clerk of Court is directed to enter judgment accordingly.

SO ORDERED.

/S/

Allyne R. Ross
United States District Judge

Dated: March 25 , 2008
Brooklyn, New York

SERVICE LIST:

*Pro Se Petitioner*
David Herion
No. 97-A-4934
Green Haven Correctional Facility
Stormville, New York 12582

*Attorney for the Respondent*
Phyllis Mintz
Assistant District Attorney
Kings County District Attorney's Office
350 Jay Street
Brooklyn, New York 11201